**2012-1435, -1436**
**(Reexamination No. 95/000,412)**
-------------------------------------------------------------------
**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
-------------------------------------------------------------------
PANDUIT CORPORATION,

Appellant,

v.

David J. Kappos, DIRECTOR,
UNITED STATES PATENT AND TRADEMARK OFFICE,

Appellee,

and

ADC TELECOMMUNICATIONS,

Cross Appellant.

Appeals from the United States Patent and Trademark Office, Board of Patent
Appeals and Interferences.

-----------------------------------------------------------------
**CROSS APPELLANT ADC TELECOMMUNICATIONS, INC.'S
PRINCIPAL AND RESPONSE BRIEF**
-----------------------------------------------------------------

Philip P. Caspers
Timothy A. Lindquist
Samuel A. Hamer
Joseph W. Winkels
CARLSON CASPERS VANDENBURGH
LINDQUIST & SCHUMAN, P.A
225 South Sixth Street, Suite 4200
Minneapolis, Minnesota  55402
Phone: (612) 436-9600
*Attorneys for Cross Appellant*
*ADC Telecommunications, Inc.*

<u>**Dated:  October 4, 2012**</u>

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Cross Appellant ADC Telecommunications, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:  ADC Telecommunications, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  ADC Telecommunications, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: ADC Telecommunications, Inc. is a wholly-owned subsidiary of Tyco Electronics Group S.A., and Tyco Electronics Group S.A. is a wholly-owned subsidiary of TE Connectivity Ltd., a publicly traded company.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

CARLSON, CASPERS, VANDENBURGH, LINDQUIST & SCHUMAN, P.A.:
Philip P. Caspers, Timothy A. Lindquist, Samuel A. Hamer, Joseph W. Winkels

MERCHANT & GOULD:  Steven C. Bruess

Dated:  October 4, 2012            /s/ Philip P. Caspers
                                        Philip P. Caspers

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................. vi

STATEMENT OF RELATED CASES ................................................1

JURISDICTIONAL STATEMENT ....................................................2

ABBREVIATIONS ...........................................................................3

COUNTER-STATEMENT OF THE ISSUES ....................................4

COUNTER-STATEMENT OF THE CASE .......................................6

COUNTER-STATEMENT OF THE FACTS .....................................8

    A.    The Context to the 220 Patent ...........................................8

    B.    The Invention – Claims 1 and 14 ....................................10

    C.    The Benefits of the Invention ..........................................12

    D.    References Applied by the Board ......................................14

        1.    Scheuermann ...........................................................14

        2.    Staber .......................................................................16

        3.    Summary chart comparing certain limitations of claims 1 and 14 ...............................................................18

ADC'S CROSS-APPEAL ...............................................................20

SUMMARY OF ARGUMENT .........................................................20

ARGUMENT ..................................................................................22

STANDARD OF REVIEW ..............................................................22

I.    THE BOARD ERRED IN REJECTING CLAIMS 1-9, 12-13 AND 21 AS ANTICIPATED BY STABER ...............................................24

    A.    The Board Clearly Erred in Concluding that Staber's Device is Mountable "without modifying" the First Trough Section .................24

        1.    The Board's interpretation of "without modifying" is wrong ........................................................................24

2.    The Board's finding that Staber teaches mounting "without modifying" is not supported by substantial evidence ....................................................................................26

B.    The Board Clearly Erred in Concluding that Staber Discloses a "first trough section" ..........................................................................30

C.    The Board Cearly Erred in Concluding that Staber Discloses a "cable exit pathway extending over the top edge of the first trough section" ....................................................................34

D.    The Board Erred in Concluding that Staber Discloses a Curved Portion of a Cable Exit Surface that "leads upwardly after extending over the upstanding side" as Recited in Claim 21..............34

II.    THE BOARD ERRED IN REJECTING CLAIMS 10, 14-16, 18, 23 AND 26 UNDER 35 U.S.C. §103 BASED ON STABER IN VIEW OF SCHEUERMANN .............................................................................38

A.    Claims 10 and 18 ..........................................................................38

B.    Claims 14-16, 23 and 26 ..............................................................39

1.    The Board used an improper claim construction that ignored claim limitations regarding the orientation of the upper surface ..........................................................................39

2.    None of the references discloses the limitations ignored by the Board's improper claim construction............................41

3.    The Board erred in concluding that Staber discloses a bottom surface that "leads upwardly after extending over the upstanding side" as recited in dependent claim 26.............46

PANDUIT'S APPEAL ........................................................................................48

SUMMARY OF ARGUMENT ...........................................................................48

ARGUMENT ......................................................................................................49

STANDARD OF REVIEW ................................................................................49

I.    THE BOARD CORRECTLY FOUND THAT PANDUIT'S PROPOSED REJECTIONS TO CLAIMS 17–20 AND 22–25 WERE NOT APPEALABLE ..........................................................................49

A.    The Board Correctly Held that Rule 41.67 Bars Panduit's Proposed Rejections ......................................................................49

1.    Rule 41.67 prohibits new proposed rejections on appeal ........49

2.    The Rules require a Requester to specifically propose rejections that it wants to be considered ....................................51

3.    Panduit's proposed rejections of claims 17–20 and 22–25 were not "easily discernible" from its submission to the Examiner ...................................................................................53

B.    The Board Correctly Found That Panduit's Proposed Rejections Of Claims 17–20 and 22–25 Were Not Appealable Because They Were Not Included in the RAN ....................................................55

1.    The Board's interpretation of its rule governing how issues are preserved for appeal is reasonable and entitled to deference ...................................................................................55

2.    Panduit's interpretation of Rule 41.61 is incorrect and contrary to other PTO rules and procedure..............................57

II.   THE BOARD CORRECTLY REVERSED THE EXAMINER'S SECTION 103 REJECTION OF CLAIMS 1-9, 12-13 AND 18-21 BASED ON LONG IN VIEW OF STABER AND

THE BOARD CORRECTLY AFFIRMED THE EXAMINER'S REFUSAL TO ADOPT THE PROPOSED SECTION 102 REJECTION OF CLAIMS 1, 10 AND 14-16 BASED ON LONG .............59

A.    The Board Properly Construed the Term Exit Trough to Require an Open Channel ....................................................59

B.    Panduit's Discussion Regarding its Drawings is Misguided and Erroneous.................................................................61

1.    The Accuracy of Panduit's Drawings Was Not Addressed in the Board's Decision............................................61

2.    Panduit's Drawings Are Not Supported By the Disclosure of Long....................................................62

3.    Panduit's Drawings Fail to Disclose Multiple Claim Elements...................................................................67

C.    ADC's Drawings Do Not Render the Claims Invalid.........................68

1.    ADC's Drawings are Not Prior Art ..........................................69

2.    ADC's Drawings Lack Several Claim Elements......................70

D.    The Board Correctly Found that the Device in Panduit's drawings is Completely Enclosed ....................................................72

iv

III. THE BOARD CORRECTLY AFFIRMED THE EXAMINER'S REFUSAL TO ADOPT THE PROPOSED SECTION 102 REJECTION OF CLAIMS 1-10, 12 AND 13 BASED ON MEYERHOEFER ........................................................................73

    A.    The Board Correctly Found that Meyerhoefer Fails to Disclose an "exit pathway extending over the top edge of the first trough section" ..........................................................................73

    B.    Meyerhoefer Lacks Other Limitations in the Disputed Claims ..........76

IV. THE BOARD CORRECTLY AFFIRMED THE EXAMINER'S REFUSAL TO ADOPT THE PROPOSED SECTION 103 REJECTION OF CLAIMS 1, 10 AND 14 BASED ON SCHEUERMANN ..........................................................................77

    A.    The Board Correctly Found that Scheuermann Fails to Disclose an "upwardly curved portion" in Claims 1 and 10 and a "first curved portion leading upwardly" in Claim 14 ...................................77

    B.    Scheuermann Lacks Other Limitations in the Disputed Claims .........80

    V.    THE BOARD CORRECTLY REVERSED THE EXAMINER'S REJECTION OF CLAIM 26 UNDER 35 U.S.C. §112, ¶2 ..........................................................................82

    A.    The Showing Required to Satisfy the Definiteness Requirement is Low ..........................................................................82

    B.    The Claim Language is Not Insoluably Ambiguous ..........................82

CONCLUSION ..........................................................................85

# TABLE OF AUTHORITIES

## Cases

Auer v. Robbins
    519 U.S. 452 (1997) ................................................................23

Belkin Int'l, Inc. v. Kappos, No. 2012-1090, 2012 U.S. App. LEXIS 20545 (Fed.
    Cir. Oct. 2, 2012) ...................................................... 51, 55, 57

Bicon, Inc. v. Straumann Co.
    441 F.3d 945 (Fed. Cir. 2006) .................................................75

Cat Tech LLC v. TubeMaster, Inc.
    528 F.3d 871 (Fed. Cir. 2008) .................................................75

Cooper Techs. Co. v. Dudas
    536 F.3d 1330 (Fed. Cir. 2008) ..............................................55

Eli Lilly & Co. v. Bd. of Regents of the Univ. of Wash.
    334 F.3d 1264 (Fed. Cir. 2003) ......................................... 23, 56

Finisar Corp., v. DirecTV Group, Inc.
    523 F.3d 1323 (Fed. Cir. 2008) ..............................................82

Hyatt v. Dudas
    551 F.3d 1307 (Fed. Cir. 2008) ..............................................23

In re Fout
    675 F.2d 297 (C.C.P.A. 1982) ...............................................69

In re Gartside
    203 F.3d 1305 (Fed. Cir. 2000) ..............................................22

In re Hyatt
    211 F.3d 1367 (Fed. Cir. 2000) ..............................................22

In re Klein
    647 F.3d 1343 (Fed. Cir. 2011) ..............................................22

In re Nomiya
    509 F.2d 566 (C.C.P.A. 1975) ...............................................69

In re NTP, Inc.
    654 F.3d 1268 (Fed. Cir. 2011) ..............................................22

In re Swanson
    540 F.3d 1368 (Fed. Cir. 2008) ..............................................22

Marrin v. Griffin
    599 F.3d 1290 (Fed. Cir. 2010). ............................................................41

Orthokinetics, Inc. v. Safety Travel Chairs, Inc.
    806 F.2d 1565 (Fed. Cir. 1986) ..........................................................40

Quantum Corp. v. Rodime PLC
    65 F.3d 1577 (Fed. Cir. 1995) ..............................................................74

Rapoport v. Dement
    254 F.3d 1053 (Fed. Cir. 2001) ............................................................23

Riverwood Int'l Corp. v. R.A. Jones & Co.
    324 F.3d 1346 (Fed. Cir. 2003) ............................................................69

Star Scientific, Inc. v. R.J. Reynolds Tabacco Co.
    655 F.3d 1364 (Fed. Cir. 2011) ............................................................82

Steven v. Tamai
    366 F.3d 1325 (Fed. Cir. 2004) ............................................................22

**Statutes**

28 U.S.C. § 1295 ..............................................................................................2

35 U.S.C. § 134 ........................................................................................ 2, 55

35 U.S.C. § 141 ..............................................................................................2

35 U.S.C. § 142 ..............................................................................................2

35 U.S.C. § 2 ..................................................................................................55

35 U.S.C. § 314 ..............................................................................................51

35 U.S.C. §112 ....................................................................................... v, 82

37 C.F.R. § 1.183 ...........................................................................................50

37 C.F.R. § 1.947 ...........................................................................................51

37 C.F.R. § 1.953 .................................................................................... 57, 58

37 C.F.R. § 1.983 ..................................................................................... 2, 49

37 C.F.R. § 41 ......................................................................... 49, 55, 57

37 C.F.R. §1.181 ............................................................................................50

**Other Authorities**

MPEP § 2617 ............................................................................... 52, 53, 54

MPEP § 2666.05 ....................................................................................................53

MPEP § 2673 .......................................................................................................57

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding was previously before this or any other appellate court.

The patent at issue in this appeal is related to three other patents that are in *inter partes* reexamination.  Two of these *inter partes* reexaminations are currently pending at the United States Patent and Trademark Office.  *See* Reexamination Control No. 95/000,411 (Reexamination of U.S. Patent No. 6,597,854) and Reexamination Control No. 95/000,415 (Reexamination of U.S. Patent No. 6,925,242).  The third related reexamination is on appeal and cross-appeal to this Court.  *See* Appeal Nos. 2012-1437, -1438 (Reexamination 95/000,413)(regarding U.S. Patent No. 7,167,625).

The patent that is at issue in this appeal, as well as the other three above-mentioned patents, are the subject of a patent infringement action pending in the United States District Court for the District of Minnesota, *ADC Telecommunications, Inc. v. Panduit Corp.*, Civil Action No. 07-cv-04452 (DWF/SER).  The Minnesota action has been stayed pending the outcome of this reexamination and the other above-mentioned reexaminations.

# **JURISDICTIONAL STATEMENT**

The Board had jurisdiction of this reexamination pursuant to 35 U.S.C. § 134, and this Court has jurisdiction to hear this appeal and cross-appeal pursuant to 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(A). Panduit timely filed its appeal from the Board's February 23, 2012 decision, and ADC timely filed its cross-appeal from the Board's February 23, 2012 decision, as provided in 35 U.S.C. § 142 and 37 C.F.R. § 1.983.

**ABBREVIATIONS**

| PARTIES | |
|---|---|
| Panduit | Appellant Panduit Corporation |
| ADC | Cross Appellant ADC Telecommunications, Inc. |
| | |
| **PATENTS** | |
| the '220 patent | U.S. Patent No. 6,868,220 |
| Long | U.S. Patent No. 5,872,336 |
| Meyerhoefer | U.S. Patent No. 6,044,194 |
| Scheuermann | German Published Patent App. No. DE 37 42 448 |
| Staber | U.S. Patent No. 5,399,814 |

# COUNTER-STATEMENT OF THE ISSUES

**On ADC's Cross-Appeal:**

I.    Did the Board err in rejecting claims 1–9, 12–13 and 21 under § 102 based on Staber by:

a.    interpreting the language about mounting without modifying  to require a time limitation where no such limitation is recited;

b.    ignoring Staber's reliance on holes cut into the flange to mount the cable bridge based on an alleged alternative means of mounting that is never taught in Staber;

c.    finding that Staber's disclosure of a side flange on an equipment rack discloses a trough section and that Staber's bridge, which is always directed in a downward direction and which passes around a vertically-running flange, teaches routing a cable exit pathway over the top edge of a trough section; and

d.    ignoring the claim language that requires "a curved portion of the cable exit surface leads upwardly after extending over the upstanding side" by interpreting this language to be mere intended use, not a structural limitation?

II.    Did the Board err in rejecting claims 10, 14–16, 18, 23 and 26 under § 103 based on Staber plus Scheuermann by:

a.    repeating the same mistakes with respect to Staber listed above; and

      b.    ignoring by interpreting as mere intended use claim language that limits the orientation and position of an upper surface, specifically that the claimed device include an upper surface "positioned above and at least partially facing a bottom of the first trough section"?

**On Panduit's Appeal:**

ADC does not disagree with Panduit's statement of the issues on its appeal.

## COUNTER-STATEMENT OF THE CASE

This appeal involves an *inter partes* reexamination of the '220 patent.

The Examiner's initial Office Action adopted two of Panduit's proposed rejections, but refused to adopt any of the other proposed rejections. A464-76.

On March 12, 2009, ADC filed an Amendment and Response. ADC amended the independent claims, and added ten new dependent claims (i.e., claims 17–26). A442-47

Panduit filed a Reply, responding to the Examiner's refusal to adopt certain of Panduit's proposed rejections, arguing that ADC's amendments to the existing claims did not overcome the Examiner's adopted rejections. Regarding new dependent claims 17–26, Panduit briefly commented on these claims, but did not propose any rejections for them. A438-39.

The Examiner issued an Action Closing Prosecution ("ACP") maintaining his previously- adopted rejections and again refusing to adopt any of Panduit's other proposed rejections. In a section entitled "Claim Rejections Raised by Examiner," the Examiner rejected some of the claims on grounds that Panduit had never asserted, including rejections for some of the newly-added dependent claims. A393-411.

The Examiner subsequently issued a Right of Appeal Notice ("RAN") which adopted all the findings from the ACP. The RAN did not identify any proposed rejections from Panduit regarding new claims 17-26.

The parties appealed to the Board. ADC appealed the Examiner's adoption of certain rejections, and Panduit appealed the Examiner's refusal to adopt its proposed rejections. In addition, and despite having never proposed any rejections for any of new claims 17-26, Panduit asked the Board to adopt several new rejections for claims 17-20 and 22-25. The Examiner's Answer, submitted after the parties' initial appeal briefs, stated that Panduit's proposed rejections for claims 17-20 and 22-25 had not been proposed to the Examiner, and thus should not be considered as part of the appeal. A228.

On June 22, 2011, the Board issued its Decision on Appeal. The Board reversed two of the rejections that the Examiner had made, and affirmed two of the other rejections. The Board concluded that Panduit's proposed rejections for claims 17-20 and 22-25 were not appealable because they had not been raised with the Examiner and were not listed in the RAN.

On February 23, 2012, the Board issued a decision denying Panduit's rehearing request.

## COUNTER-STATEMENT OF THE FACTS

**A.    The Context to the '220 Patent**

The '220 patent discloses a cable exit trough that routes optical fiber cables out of a lateral trough and downward (toward the floor) to telecommunication equipment.  Fiber routing systems guide and protect fiber cables between telecommunications equipment.  Such systems are typically installed in ceiling areas above equipment racks.  *See, e.g.*, A19 (col. 1:25-50).   In a typical installation, long, straight trough sections run horizontally near the ceiling above equipment racks, and optical fiber cables may be routed from equipment on a first rack, up to the lateral trough sections near the ceiling, into and then horizontally through the lateral trough sections until they reach a point above a second equipment rack, and then out of the lateral trough and down to the desired equipment.  The exit trough disclosed in the present specification transitions the optical fiber cables out of the lateral trough sections.

Prior to the present invention, cable exit systems for troughs relied on defining a path through the sidewall of the lateral trough.  This required cutting the sidewall and inserting fittings to transition the fibers through the sidewall.

One example is disclosed in Fig. 8 of U.S. Patent No. 5,067,678, filed in 1989, disclosing a downspout fitting for transitioning cables out of the lateral troughs.  A3025 (FIG. 8); A3047 (col. 6:36-49).  The system required cutting out a

8

portion of the straight trough and replacing it with the downspout fitting. The downspout fitting defined a hole through the side and/or bottom wall of the fitting to allow cables to exit the lateral trough. Another prior approach was to cut a slot into a sidewall of the straight trough section and place a fitting into the slot to route the fiber through the sidewall. *See* A3007 ("Drop-off connector…provides a safe exit for fibres down to equipment below. It fits snugly into a cut out using Cut Out Tool…"); A3012 (element G). These two known approaches are illustrated below:



By defining a path through the sidewall of the lateral trough, these cable exit systems created a direct path to the destination equipment, and therefore minimized bending of the optical fiber cables. Such cable exit systems did not require additional space above the cable routing system in the ceiling area above the equipment racks.

**B.    The Invention – Claims 1 and 14**

The '220 inventors went against the teaching of previous cable exit systems which routed the cables through the sidewall. By contrast, the '220 inventors developed a cable exit trough system (shown below), that initially directs the optical fiber cables in an upward direction (i.e., in a direction that is the opposite of the end destination below the lateral trough). This indirect-path approach required more bending of the fiber cables. It also required that space above the cable exit system be used.

The '220 patent includes two independent claims, 1 and 14. Claim 1 is directed to a cable routing system with a cable exit trough and a trough section where the exit trough is mountable to a trough section. Claim 14 is directed to a cable exit trough. Consistent with the embodiment illustrated below, both claims 1 and 14 recite a cable exit trough that routes fiber cables over the sidewall of the trough, i.e., as opposed to through the sidewall. Routing over the sidewall means that the exit trough can be mounted to the lateral trough without modifications to the lateral trough. Claim 1 recites that the cable exit trough be "releasably mountable to the first trough section without modifying the first trough section". A443. Claim 14 further requires the exit trough includes "an upper surface positioned above and at least partially facing a bottom" of the first trough section. A446. An example of such an upper surface for guiding cables is identified in the

embodiment below.  By positioning such a guiding surface above the path of the

cable, the surface helps to prevent cables from slipping up out of the exit trough.



**bottom of first trough section**

**upper surface facing the bottom of the lateral trough section**

**Summary of Certain Limitations of Claims 1 and 14**

**Claims 1 and 14 require an exit pathway that routes cables over the top edge of the sidewall of the first trough section.**

**Claim 1 requires the cable exit trough to be releasably mountable to the first trough section without modifying the first trough section.**

11

**Claim 14 requires an upper surface positioned above and at least partially facing a bottom of the first trough.**

## C.    The Benefits of the Invention

Telecommunication offices are frequently modified due to advances in equipment, resulting in frequent changes to cable exit needs for the routing system. Prior systems required modifying the lateral trough section by cutting it or providing for openings in the sidewall.  When the system needs change and there is no longer a need to exit cables at that point along a trough section, the exit components cannot be easily removed or repositioned, because the trough section would need to be repaired or replaced unless the choice was made to leave a cut-out or an opening in the trough section.  Leaving a cut-out or an opening at the previous mounting location in the lateral trough sidewall, regardless of when that cut-out or opening was made (i.e., whether made in advance of install or at the time of install), is not desirable as it unnecessarily exposes existing fibers in the trough.

Further, when adding a fitting for exiting cables through the sidewall at a new location, the process of cutting the sidewall or inserting mounting structure, such as a screw, into the trough that is already routing fragile optical fibers creates an undesirable risk of damage to the fibers.

12

The exit trough of the '220 patent overcomes these problems while still maintaining the necessary minimum bend radius to protect the fragile fiber cables. By using the space above the lateral trough and avoiding cutting the lateral trough sidewall, the '220 inventors created a new exit trough system that is not destructive of the lateral trough. No mounting structure is inserted through cut-outs or holes through the sidewall, thus minimizing risk of damage to the fibers in the trough. The disclosed exit trough routes the fiber cables first upwardly (in the opposite direction from the end destination) and then over the top of the lateral trough sidewall, not through it. The exit trough includes a combination of curved surfaces for safely transitioning the cables over the top of the lateral trough sidewall. An example of such a surface is the upper surface recited in claim 14 that the surface helps to prevent cables from slipping up out of the exit trough.

The new cable exit trough is much easier to install, for example, when new equipment is added, and much easier to reposition, for example, when equipment is moved. And, in both cases, the '220 exit trough system reduces the risk of damage to the optical fiber cables that may already be present in the lateral trough when the exit trough is installed.

**D.    References Applied by the Board**

For the claims that stand rejected, the Board applied two references:

Scheuermann (A535-539) and Staber (A530-534).   Listed below is a quick

reference for understanding the disclosures.

**1.    Scheuermann**

Scheuermann is directed to a cable exit trough that routes cables out of a

lateral trough.



*Fig. 1*

Scheuermann discloses:

-   sidewalls (2) have been cut with slots (3) (A539; A536, lines 1–13);

-   a "narrow area" or flange of sidewall remains under the slots (see, e.g., A536, lines 7-9; A537,  lines 1-2);

14

- a cable guide part having two horizontally curved sidewalls (6, 9) and a bottom wall (8) that curves downward (A537, lines 9-11; A539);

- tongues (4) are broken off the sidewall to create a larger opening for positioning cable guide within the cable duct (A537, lines 6-9); and

- wall parts (5 or 12) engage the slots (3) cut into the duct to mount the cable guide part to the cable duct (A537, lines 21-24).

Scheuermann does <u>NOT</u> disclose:

- a first trough section having an upstanding side with a substantially uniform height (as required in claims 1 and 14);

- mounting without modifying the trough section (as required in claim 1);

- routing cables over the top edge of a trough sidewall (as required in claims 1 and 14);

- an upper surface positioned above and at least partially facing a bottom of first trough section (as required in claim 14);

- an exit trough curved surface that has an upwardly curved portion extending from within the first trough section (as required in claim 1);

- a bottom surface having a first curved portion leading upwardly with respect to the first trough section (as required in claim 1);

- an exit trough curved surface that extends upwardly after transitioning over a sidewall of a trough section (as required in claims 21 and 26); and

15

      - an exit trough curved surface that transitions from
       vertical to horizontal (as required in claims 19, 20, 24
       and 25).

**2.  Staber**

Staber is directed to a cable bridge that protects a descending cable around a

short vertically-running flange on the side of an equipment frame.  A530

(Abstract); A534 (col. 1:5–17); A533.  Staber does not disclose routing of cables

out of lateral or vertical troughs.



Staber discloses:

      - a cable bridge having a convex surface (12) and two
       straight, parallel sidewalls (13, 14) that route  a
       descending cable around a protruding flange along the
       side of an equipment rack (A530, Abstract; A532;
       A533, col. 1:5–17);

- angled slots (17, 18) underneath the curved surface receive the narrow flange (A532-533); and

- mounting to the flange using a screw (8) inserted through a side hole formed in the bridge and received into a hole cut in flange (9) (A533; A534, col. 2:16–17).

Staber does <u>NOT</u> disclose:

- a first trough section (as required in claims 1 and 14);

- mounting an exit trough to a first trough section without modifying the trough section (as required in claim 1);

- routing cables over the top edge of a trough sidewall (as required in claims 1 and 14);

- a sidewall surface having a curved portion leading from a direction generally parallel to the cable pathway of the trough section toward a direction generally perpendicular to the cable pathway (as required in claim 14);

- an upper surface positioned above and at least partially facing a bottom of a first trough section (as required in claim 14);

- a curved cable exit surface that is curved in a direction substantially perpendicular to the lateral trough section (as required in claims 18 and 23);

- transition surfaces to gradually transition cables from a first trough section to the cable exit trough (as required in claim 10);

- an exit trough curved surface that leads upwardly after transitioning over a sidewall (as required in claims 21 and 26); and

17

- an exit trough curved surface that transitions from
vertical to horizontal (as required in claims 19, 20, 24
and 25).

**3.    Summary chart comparing certain limitations of claims 1 and 14**

The following chart isolates and compares certain claimed features of

independent claims 1 and 14 to the applied references.

| The '220 Patent | Scheuermann | Staber |
|---|---|---|
| **Claims 1 and 14 require an exit pathway that routes cables over the top edge of the sidewall of the first trough section.** | **No.**<br><br>**Exit pathway defined <u>through</u> the sidewall <u>over a short flange</u>.** | **No.**<br><br>**Exit pathway defined <u>over a short flange</u>, and not over a sidewall of a lateral or vertical trough.** |
| **Claim 1 requires the cable exit trough to be releasably mountable to the first trough section without modifying the first trough section.** | **No.**<br><br>**Discloses cutting of sidewall of lateral trough.**<br><br>**After the sidewall of the trough is cut, only a short flange remains for cables to pass as they are routed through the sidewall.** | **No.**<br><br>**Discloses use of holes cut into short flange.**<br><br>**Staber does not disclose routing cables over a sidewall of a trough. Stable discloses a short flange of a height that is less than the thickness of a single cable, corresponding at most to the short flange that the cable passes over in Scheuermann as the cable is routed <u>through</u>** |

| | | |
|---|---|---|
| | | **the sidewall.** |
| **Claim 14 requires an upper surface positioned above and at least partially facing a bottom of the first trough.** | **No.** | **No.** |

# ADC'S CROSS-APPEAL

## SUMMARY OF ARGUMENT

### The Errors in the Anticipation Findings Based on Staber (claim 1, and dependant claims 2-9, 12-13, and 21)

The Board erred by reading a timing requirement into claim 1's limitation that "releasably mountable to the first trough section without modifying the first trough section."  The conclusion that this limitation could only be satisfied if the modification was made at the time of installation of the exit trough is not supported by the specification and demonstrates misunderstanding of the disclosed invention and its benefits.

The Board erred in finding that Staber discloses mounting "without modifying" the trough section. Staber unmistakably and only describes mounting a device to a structure using holes that have been cut into the structure.

The Board erred in finding that Staber discloses an exit trough with an exit pathway that routes cables over the top edge of the sidewall of the first trough section.  Staber discloses a cable bridge for routing a single cable around a vertically-running flange of an equipment rack, and not over a sidewall of a lateral or vertical trough.

The Board erred in construing "a curved portion of the cable exit surface leads upwardly after extending over the upstanding side" of the trough (claim 21) as mere intended use.  By this error, the Board was able to ignore important

20

limitations relating to the structure of an exit trough pathway that routes cables over the top edge of the sidewall of the first trough section.

**The Errors in the Obviousness Findings Based on Staber plus Scheuerman (claims 10, 14–16, 18, 23 and 26)**

The Board repeated the same mistakes with respect to Staber in its obviousness analysis.

Claims 10 and 18 require "cable exit pathway extending over the top edge of the first trough section" and "releasably moutable ... without modifying."  Neither Staber nor Scheuermann discloses these features.  Thus the Boards finding of obviousness is improper.

The cable exit trough of claim 14 requires an upper surface positioned above and at least partially facing a bottom of the first trough.  The Board erred in construing this limitation as mere intended use.  By that error, the Board was able to ignore important limitations in rejecting claim 14 (and dependant claims 15, 16, 23 and 26).  None of the references discloses these limitations.

# ARGUMENT

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions *de novo*. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). Such legal conclusions include issues of claim construction and statutory interpretation. *In re NTP, Inc.*, 654 F.3d 1268, 1274 (Fed. Cir. 2011) (citation omitted); *Steven v. Tamai*, 366 F.3d 1325, 1330 (Fed. Cir. 2004). Board factual findings are reviewed for substantial evidence. *In re Gartside*, 203 F.3d at 1316. The Board's ultimate obviousness decision is a legal conclusion reviewed *de novo*, but the Board's underlying factual findings are reviewed for substantial evidence. *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011). Anticipation is a question of fact reviewed for substantial evidence. *In re Hyatt*, 211 F.3d 1367, 1371–72 (Fed. Cir. 2000).

Regarding the prior art, the scope of an examiner's previous consideration of a reference is a question of fact reviewed for substantial evidence. *In re Swanson*, 540 F.3d 1368, 1380–81 (Fed. Cir. 2008) (*citing* H.R. Rep. No. 107-120, at 3 (stating that there should be "substantial evidence" that the examiner "did not properly understand the reference, or did not consider a portion of the reference in making his decision.")). What a prior art reference teaches is a question of fact and the Board's characterization of what a reference does or does not disclose is

22

reviewed for substantial evidence.  *Rapoport v. Dement*, 254 F.3d 1053, 1060–63 (Fed. Cir. 2001).

Finally, this Court gives an agency's interpretation of its own regulation "substantial deference" and that interpretation is accepted unless it is "plainly erroneous or inconsistent with the regulation."  *Eli Lilly & Co. v. Bd. of Regents of the Univ. of Wash.*, 334 F.3d 1264, 1266 (Fed. Cir. 2003) (*citing Auer v. Robbins*, 519 U.S. 452, 461–62 (1997)); *see Hyatt v. Dudas*, 551 F.3d 1307, 1311 (Fed. Cir. 2008) ("An agency's interpretation of its own regulation is entitled to substantial deference, and 'the reviewing court should give effect to the agency's interpretation so long as it is reasonable.'").

**I.**

## THE BOARD ERRED IN REJECTING CLAIMS 1-9, 12-13 AND 21 AS ANTICIPATED BY STABER

**A.**   **The Board Clearly Erred in Concluding that Staber's Device is Mountable "without modifying" the First Trough Section**

Claim 1 (and thus dependent claims 2-9, 12-13 and 21) requires that the exit trough be "releasably mountable to the first trough section without modifying the first trough section." The language "without modifying the first trough section" was added during reexamination in response to a rejection based on Staber. A443.

The Board found that Staber teaches this limitation by adopting an erroneous claim interpretation, and making a factual finding that is not supported by substantial evidence and that contradicts the teaching of Staber.

### 1.   **The Board's interpretation of "without modifying" is wrong**

The Board's decision included the following claim interpretation:

> [W]e interpret releasably mountable "without modifying" to mean that the first trough is provided in a form that does not require making a change to it during installation in order to attach the exit trough.

A69. This interpretation includes a timing requirement that the trough not be modified (e.g., cut) only at the precise time that the exit trough is mounted to the trough section, i.e., "during installation". Thus, the Board's interpretation reads on an exit trough that mounts using precut holes or notched cutouts as long as no further holes are made at the time of installation.

24

First, there is no support in the '220 patent for this interpretation.   The Board quotes portions of the specification.  A68-69.  However, these sections of the specification do not teach that the invention is dependent on whether or not the lateral trough is cut or modified at the precise time that the exit trough is mounted to the lateral trough.

Second, the Board's interpretation ignores the invention of the '220 patent. By designing an exit trough that could be mounted to the lateral trough without modifying the lateral trough (e.g., cutting holes or slots in the lateral trough), the inventors provided a system that could be quickly and efficiently reconfigured when desired and still maintain a solid, encloseable trough.  *See* A19 (col. 1:33–39).  Without this feature, if the exit trough were to be moved to a different location, the lateral trough would need to be repaired to prevent unwanted dust and debris from entering the trough through the left-over hole or slots cut into the side of the trough.  This benefit of the invention is true whether the lateral trough has been modified with mounting slots two months prior to installation, two weeks prior to installation or at the exact time the exit trough is installed onto the trough section.

Third, the Board's interpretation is unreasonable because it adds limitations to the claim.  The claim requires releasably mounting "without modifying" the

lateral trough.  The Board rewrites the claim to say releasably mounting "without modifying at the time of installation."

Finally, the Board's interpretation brings ambiguity into the claim.  Under the Board's interpretation the relevant inquiry is whether the modification occurs "during installation".  Does this mean that the modification must occur contemporaneous with the actual mounting of the exit trough?  Is this requirement (i.e., during installation) met if the trough section is modified (e.g., cut) 15 minutes before the exit trough installed?  What if it is modified two hours or two days before the exit trough is actually mounted?  There is nothing in the patent to provide instruction on these questions because, as explained above, it makes no difference when the modification occurs.  Regardless of when it occurs, modifying the trough section creates problems that the invention intended to address.

### 2. The Board's finding that Staber teaches mounting "without modifying" is not supported by substantial evidence

As clearly seen in Staber's FIG. 3, the flange 9 has been modified by cutting holes into flange 9 at regular intervals up and down its length.  A533.  Staber's cable bridge is mounted to the flange 9 using a screw (8) inserted through a similar hole formed in the side of the bridge that is aligned over one of the holes in flange 9.  A534 (col. 2:21–24).



holes cut into
flange 9

screw mounts
bridge to flange

FIG. 3

The Board, however, disregarded Staber's use of the screw through the hole because the Board found that disclosure to be optional to an "alternative" Staber disclosure for holding the bridge to the flange. A75. The Board concluded that the use of the screw to mount the bridge to the flange was presented by Staber as an alternative to using the flexible ties to secure the bridge to the flange. The Board said Staber "characterizes this [screw] arrangement as a second embodiment. . . . ADC's argument . . . ignores the plain language of Staber, including embodiments in which a flexible tie is used to hold the cable bridge in place." A75. This reading of Staber is clearly erroneous. Staber nowhere describes the use of a flexible tie to secure the cable bridge to the flange.

In its analysis, the Board noted that Staber says "holes *may* be used to seat a screw holding the cable bridge." A75. Staber's use of the term "may" does not

itself amount to an alternative disclosure for mounting the cable bridge to the vertical flange. Staber's only disclosure for holding the bridge to the vertical flange is through the use of screw through the hole in the flange. Staber does not describe or identify any alternative structure.

The flexible ties are described by Staber as holding the cable to the bridge, not the bridge to the flange. "Flexible ties 7 secure cable 6 within the channel of the cable bridge." A534 (col. 2:24–25). Therefore, flexible ties are *not* disclosed in Staber as an alternative to using the screw to hold the bridge to the flange. The Board's finding is clearly erroneous.

The reference to an "alternative embodiment" by Staber is a reference to a difference in how the flexible ties are secured to the bridge, not in how the bridge is secured to the flange. In the embodiment shown in FIGS. 1 and 2 the bridge includes slots 15 and 16 that accommodate flexible ties to be wrapped around the cable and bridge to secure the cable to the bridge. A531–532. In the alternative embodiment shown in FIG. 3, the bridge includes holes instead of slots 15 and 16 for securing the ties to the bridge. A534, col. 2:25-26 ("In this [second] embodiment, holes rather than slots are used to secure the ties."). The difference in the two embodiments is how the flexible ties are secured to the bridge, not how the bridge is secured to the vertical flange. Significantly, both embodiments include

the mounting holes formed in the side of the bridge for receiving the screw. *See*

FIG. 2 (first embodiment) and FIG. 3 (second embodiment).



slots

holes

From FIG. 3 of Staber

The "alternative embodiment" of FIG. 3 (at right) has holes instead of slots for receiving the flexible ties that hold the cable on the bridge. FIG. 3 does ***not*** disclose a different means for mounting the bridge to the flange. For that purpose, both embodiments define screw holes for mounting the bridge to the flange.

Even if the Board was correct that that the flexible ties were disclosed as an

alternative embodiment for securing the bridge to the flange, there would still need

to be holes in the flange to receive the flexible ties. In other words, Staber would

***still*** rely on holes cut into the flange to mount the bridge using the flexible ties.

29

The only other alternative that would possibly allow the flexible ties to mount the bridge to the flange would be to conclude that the flange was not adjoined to any other surface, allowing the flexible ties to encircle the flange. But this would mean that the flange was not part of a trough which the Board must rely upon to conclude that Staber teaches routing cable over the side of a trough. Therefore, even under the Board's errant reading, Staber does not teach mounting the cable bridge to the flange without using holes cut into the flange, or alternatively proves that the flange in Staber is *not* part of a trough.

**B.      The Board Clearly Erred in Concluding that Staber Discloses a "first trough section"**

The Examiner concluded that Staber discloses a first trough section. In support, the Examiner stated the following:

> In Fig. 3 of Staber et al., the rack or lateral trough section is illustrated as having a generally U-shape, with the flange 9 and a second flange (shown to the far left in Fig. 3) extending from a bottom portion (the portion located beneath/behind the cable 6 in Fig. 3) of the rack.

A401. The Examiner's conclusion that Staber discloses a "trough section" is made with reference to Figure 3, which is reproduced below with highlighting and annotations. The Examiner found that a "trough section" is formed by the flange 9 (labeled "C" and shaded yellow below), the green-shaded area (labeled "A" below), and the un-shaded area (labeled "B" below) that lies between areas A and C.



The Board asserts there is a trough section defined here.

The Board stated that the Examiner's finding (quoted above) provided a sound basis for the Examiner's conclusion that Staber taught a "first trough section," and therefore ADC had to prove that Staber did not disclose this claim element. A76. The Board stated that ADC had not provided any evidence or testimony why its interpretation of Figure 3 was more reasonable that the Examiner's. A76.

The Board erred in concluding that the Examiner had provided a reasonable interpretation of what Figure 3 discloses. For example, the Examiner erroneously equated a rack with a lateral trough section. *See* A401 ("In Fig. 3 of Staber et al., the rack or lateral trough section is illustrated ..."). A rack is not a trough section.

31

A rack is generally an upstanding frame that can be used to support communications equipment panels bolted to the rack.  A side portion of such a rack is shown in Staber's Fig. 3.  In contrast, trough sections transport and deliver cables between two different equipment racks inside a telecommunications office.  Most often these troughs are elevated above the equipment racks in ceiling areas.  A19 (col. 1:29–37).  A cable running from equipment in a first rack that needs to connect to equipment in a second rack is routed vertically up to a trough.  The trough then guides the cable horizontally to another area of the equipment office where the cable exits the lateral trough and drops down to the second equipment rack below the trough.  This transition (from the trough sections into the downward direction toward the equipment rack) is one of the principle applications of the present invention.  The trough section, however, is not to be confused with a rack, and it was a gross error for the Examiner and the Board to find otherwise.

Another example of the Examiner's erroneous reading of Staber is the Examiner's finding regarding the alleged trough surfaces shown in Staber's Figure 3.  According to the Examiner, the alleged trough included a second flange (highlighted in green and labeled "A" in the annotated drawing above) and a bottom (labeled "B" in the annotated drawing above).  A401.  Neither of these areas ("A" or "B") are mentioned anywhere in Staber's disclosure.  While the green-shaded area "A" has shading lines indicating there is a surface there, it is

32

impossible to determine its orientation.   The Examiner assumed, without any

basis, that it is parallel to flange 9 and thus forms a second sidewall of a trough.

However, it could be perpendicular to flange 9, in which case there is no U-shaped

cross section (i.e., two upstanding sides) to define a trough section.  In fact, it is not

even clear that that the green-shaded area (labeled "A" above) is part of the rack on

which the flange is positioned.

More problematic, however, is that there is no teaching or indication in FIG.

3 of Staber that there is any surface at all in the area labeled "B".  Unlike the other

surfaces in FIG. 3 which each have shading or other elements to indicate a surface,

portion "B" does not have any shading lines to suggest that there is any surface

there at all.  Even if portion "B" were a surface, neither FIG. 3 nor any other

passage of Staber describes the flange 9 as extending from such a surface as

required by the claims.  It is impossible to tell from the figure, and Staber does not

describe, whether flange 9 is connected to portion "B" at all.  The Examiner and

the Board cannot rely on empty space—an absence of any teaching at all—as a

"reasonable" basis for finding a trough section in Staber.  In view of these errors

(and unsubstantiated assertions) about what Staber actually discloses the Board had

no basis to conclude that the Examiner had provided a "sound rationale" for its

conclusion that Staber disclosed a first trough section.

Moreover, the Board's statement that ADC had not provided any evidence on what Figure 3 shows is wrong. ADC relied on the drawings themselves as evidence that the area, labeled "B" above, is not a surface at all. The area labeled "B" does not have any shading, whereas the figure provides shading for every other surface of the structure. A191-92; A302-303.

## C. The Board Clearly Erred in Concluding that Staber Discloses a "cable exit pathway extending over the top edge of the first trough section"

Claim 1 (and claims depending therefrom) recites that the exit trough "defines a cable exit pathway" with that cable exit pathway "extending over the top edge of the first trough section." A443.

The Board's decision that this limitation is found in Staber is premised on its conclusion that Staber discloses a first trough section. As explained above, there is no evidence that Staber discloses a first trough section. All Staber shows is a short narrow flange on which a cable bridge is attached. Because Staber does not disclose a first trough section, it does not disclose a cable exit pathway that is "extending over the top edge of a first trough section."

## D. The Board Erred in Concluding that Staber Discloses a Curved Portion of a Cable Exit Surface that "leads upwardly after extending over the upstanding side" as Recited in Claim 21

Claim 21, which depends from claim 1, reads as follows:

> 21. The cable routing system of claim 1, wherein a curved portion of the cable exit surface leads upwardly after extending over the upstanding side. (A446)

34

This claimed feature is exemplified in FIG. 8 (A10) which shows surface 146 that leads cables upwardly from a point above the upstanding side of the lateral trough section until a horizontal apex is reached at a position outside the lateral trough section.



Continuing to lead the cable upwardly outside the trough makes it possible to avoid excessive bending of fibers while minimizing the amount of exit trough structure inside the lateral trough that might obstruct other fibers in the lateral trough.

The Board's conclusion is premised on a claim construction that this limitation describes only an intended use, not a structural limitation. The Board stated:

35

> The direction in which the cables are mounted is not part of the claim.  Consequently, in which direction the bottom surface "leads" is not a limitation in the claim, but an "intended use" of it which does not appear to confer an additional structure to the claimed trough.

A79.

The Board erred by interpreting the language of claim 21 as mere intended use.  It defines a structural requirement on the exit trough itself.  It expressly limits the shape and orientation of a portion of the exit surface, i.e., it must lead upwardly after extending over the upstanding side of the first trough section.  The mere fact that this structural relationship is in part defined by reference to another claimed component, the upstanding side of the first trough section, does not make the language any less structural.

The Board also erred in rejecting ADC's argument that the term "lead" in this claim language refers to leading or guiding cables.  *See* A79–80.  In rejecting ADC's argument the Board erroneously stated that the direction in which cables are being routed is not part of the claim.  A79.  Claim 1, from which claim 21 depends, recites that the cable exit surface (which claim 21 further limits) is part of a "cable guiding portion".  A443 (cable exit trough includes a "cable guiding portion having a curved cable exit surface").  In other words, the curved cable exit surface is part of the structure that guides cables, and the language "leading upwardly" refers to leading cables upwardly.

Regardless of whether the claim language requires leading of **cables** upwardly (i.e., even if the claim limitation only requires the surface to lead upwardly), Staber lacks the additional limitation in claim 21. Staber is directed to routing a cable around a **vertically-running** flange of an equipment frame. A533; A534 (col. 1:6–7). When the Staber device is mounted on the flange, the bottom surface 12 is directed downward along its entire length. *See* A533 (Fig. 3 showing Staber bridge mounted on vertical flange 9).

The Board found that because the Staber device is mounted at an acute angle with respect to the flange that there is a triangular section of the bottom surface that continues upward after extending over the flange. A79-80.

There are multiple flaws with this decision. First, this argument is based on the erroneous premise that Staber's device is mounted on a horizontally-oriented structure. See A79 (page 18 of Board's decision depicting Staber's device relative to a horizontal line labeled "path of flange 9."). This is not the figure depicted in Staber. The flange is not horizontal (as shown in the Board's decision), but is vertically-oriented along the side of a rack as shown in FIG. 3 of Staber.

Second, from FIG. 3 it is clear that the round cable in the bridge is not *lead upwardly* outside the flange as required by the claim. As explained above, the claim requires that the curved surface to lead cable upwardly after it passes over

the upstanding side.  In the rotated figure in the Board's decision, the cable reaches its apex directly over the flange and then goes downward.

Finally, Staber teaches away from the feature claimed in claim 21.  Staber teaches a cable bridge that is "as compact as possible" (A534, col. 1:34) and that has a "low profile over flange 9."  A534 (col. 2:29-30).  To achieve a low profile, Staber positions the apex of its bridge immediately above and centered on the flange.  Satisfying the limitation of claim 21 requires that the cable reach its apex outside the flange, not centered on the flange.  Modifying the Staber bridge to have a surface that leads upwardly even after crossing the flange, as recited in claim 21, would go against the teaching in Staber to maintain a low profile because it would necessarily increase the height of the bridge.

## II.

### THE BOARD ERRED IN REJECTING CLAIMS 10, 14-16, 18, 23 AND 26 UNDER 35 U.S.C. §103 BASED ON STABER IN VIEW OF SCHEUERMANN

The Board's decision at A82-87 affirms the obviousness rejection of claims 10, 14-16, 18, 23 and 26 based on Staber and Scheuermann.  The Board made several errors in its analysis, both legal and factual.

### A.    Claims 10 and 18

On appeal to the Board, ADC argued that neither Staber nor Scheuermann discloses a "cable exit pathway extending over the top edge of the first trough

section" and "releasably moutable ... without modifying."  A195-96; A307-309.

These claim elements are recited in independent claim 1 from which both claims

10 and 18 depend.

The Board erred in its conclusion that Staber discloses these limitations.  As

explained above in the discussion of claim 1, Staber does not disclose a first trough

section.  Instead, Staber merely discloses a flange.  Absent a first trough section,

Staber does not disclose a "cable exit pathway extending over the top edge" of a

first trough section as required in both of dependent claims 10 and 18.  As also

explained above regarding claim 1, Staber does not disclose an exit trough that is

"releasably mountable ... without modifying the first trough section."

Because the Board concluded (erroneously) that Staber disclose these

limitations, it did not address whether they are disclosed in Scheuermann.

However, these limitations are also not disclosed in Scheuermann for the reasons

discussed in Section IV(B) of ADC's response to Panduit's appeal (below).

**B.    Claims 14-16, 23 and 26**

   **1.    The Board used an improper claim construction that ignored
          claim limitations regarding the orientation of the upper surface**

Independent claim 14 (and dependent claims 15-16, 23 and 26) are directed

to an exit trough assembly including a bottom surface, a side wall surface and an

upper surface.  The Board gave no patentable weight to the limitations relating to

the orientation of the upper surface.  The Board concluded that the claim language

relating to the position of the upper surface was merely "intended use" and, therefore, was not entitled to any patentable weight. A85-86.

The relevant claim language regarding the upper surface of claim 14 recites:

> the exit trough assembly further comprising an upper surface *positioned above and at least partially facing a bottom of the first trough section when the exit trough assembly is mounted to the first trough section*.

A446 (emphasis added). ADC amended claim 14 during reexamination by adding the words "and at least partially facing". A445-46.

The Board incorrectly concluded that the requirement that the upper surface be "positioned above and at least partially facing" merely recited intended use. The disputed language limits the shape and orientation of the "upper surface," and is therefore a structural limitation.

That the test for determining whether the structural limitations are satisfied relies on a relationship to a different unclaimed structure (the first trough section) does not make the limitation any less structural or any less a valid limitation. *See, e.g.*, *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986) (finding a dimensional claim limitation on a travel chair written as "so dimensioned as to be insertable through the space between the doorframe of an automobile and one of the seats thereof" to state a valid claim limitation under § 112).

40

The prosecution during reexamination further shows that the disputed claim language is not mere "intended use".  In response to a prior art rejection, ADC added the requirement that the upper surface is positioned "at least partially facing" the bottom of the first trough section.  A445-46.  ADC argued that none of the cited references disclose this added feature.  A461. When a patentee relies on a recited element to distinguish the art, they are to be recognized as limitations, not mere intended use. *See, e.g.*, *Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010).  Both the Examiner and Panduit recognized that the added language was a narrowing limitation entitled to patentable weight.  In response to ADC's amendment adding the relevant language, neither Panduit nor the Examiner argued that this element was merely reciting "intended use."  Panduit also never made this assertion in its briefs submitted to the Board on appeal.  Instead, Panduit merely argued that this structural limitation was disclosed in the references.  A272-73.  In its Decision, the Board did not determine whether the added language distinguished the references because it concluded, on its own, that the claim limitation was a non-limiting statement of intended use.

### 2.    None of the references discloses the limitations ignored by the Board's improper claim construction

The limitation in claim 14 regarding the orientation of the upper surface distinguishes Staber and Scheuermann.  Neither reference discloses an upper

surface "positioned above and at least partially facing a bottom of the first trough section . . . ."

In the context of the '220 patent, a surface is an "upper" surface if it is ***above*** cables being routed through the device. Figure **1** of the '220 patent (below) includes surfaces 126 and 136 which are called "upper surface portions". A20 (col. 3:34). These surfaces are ***above*** cables that are routed through the lead-in pathways. As recited in claim 14, these upper surfaces face the bottom of the first trough section.



In contrast, the '220 patent refers to surface 146 as a "bottom trough surface" because it forms a lower surface ***below*** cables routing through the cable exit pathway 152. A20 (col. 3:49). Panduit admitted that the recitation in claim 14 of

an "upper surface" refers to a surface that is above cables.  A352, at footnote 5 ("Although called an 'upper' surface, it apparent from the specification and drawings of the '220 Patent that the upper surface (upper surface portions 126, 136) is located on the lower part of the cable exit trough.  It appears to be referred to as an upper surface because it is above the cable.").

The Scheuerman device (shown below) is comprised of a bottom surface 8 and two side walls 6, 9.  A359.  None of these is a surface that is positioned above cable (i.e., an "upper surface") that faces the bottom of the duct.  Bottom surface 8 is below the cables, and thus not an "upper surface" at all.  Regarding the side walls (6 and 9), while these extend upward relative to the cables in the device (see below), neither side wall faces the bottom 1 of the duct.



Scheuermann

*Fig. 1*

Staber similarly lacks the claimed "upper surface."  Figures 1 and 3 of
Staber (below) depict the device by itself (FIG. 1) and mounted to a flange with a
cable positioned in the pathway defined by the device (FIG. 3).  A531-533.  Like
the Scheuermann device, Staber's cable bridge has three surfaces (external surface
12 and sidewalls 13, 14) that define the channel in which the cable is positioned.
A534 (col. 2:6-7).  The external surface 12 does not meet the claim language
because it is positioned beneath the cable (and thus is not an "upper surface" at
all), and it faces in a direction away from the structure that the Board (erroneously)
concluded is the bottom of a trough.  Similarly, the sidewalls 13, 14 are not above
cables (and thus not an "upper surface").  Even if the sidewalls could be considered
an upper surface, they do not face the bottom of a trough (assuming Staber even
shows a trough at all).



The Examiner, with no analysis whatsoever about what the term "upper surface" means, concluded that Staber and Scheuermann disclose this limitation. A404.  The Examiner concluded that the ***underside*** of the bottom surface 8 of Scheuermann's device and the underside of the bottom surface 12 of Staber's device meet this limitation.

This argument is wrong for several reasons.  First, the underside of these devices is below cable that is being routed through the devices, and thus it is not an "upper" surface.  Second, this argument makes no sense when the alleged "upper surface" is compared to the surfaces on Staber and Scheuermann that correspond to the "bottom surface."  According to the Examiner, the top side of the curved wall 8 on Scheuermann and the top side of the curve wall 12 in Staber correspond to the claimed "bottom surface."  A402; A404.  If the underside of those same curved

45

walls are the "upper surfaces" (as the Examiner found), then the surface that is recited as being "upper" would be directly below the surfaces that are recited as being the "bottom" surface. This completely ignores the relative terms "bottom" and "upper" in the claim. Third, this argument conflicts with the Examiner's statements during original prosecution of the '220 patent. In the Notice of Allowability, the Examiner identified the "upper surface" as one of the critical limitations that serves to protect optical fibers from damage. A3019. The surfaces that Panduit (and the Examiner) identified as the "upper surfaces" on Staber and Scheuermann do not form any part of the cable pathway (because they are on the underside and cannot contact or guide cables) and thus have no purpose whatsoever in protecting optical fibers.

### 3. The Board erred in concluding that Staber discloses a bottom surface that "leads upwardly after extending over the upstanding side" as recited in dependent claim 26

Claim 26, which depends from claim 14, reads as follows:

> 26. The cable exit trough assembly of claim 14, wherein a first curved portion of the bottom surface leads upwardly after extending over the upstanding side.

A447. This limitation is similar to the limitation recited in dependent claim 21, discussed above. The Board found that Staber discloses this limitation for the reasons stated in its discussion of dependent claim 21. A87.

There is no evidence to support the Board's finding.  As explained above in the discussion of dependent claim 21, Staber's device is mounted to a vertical flange, and in that orientation, the alleged bottom surface 12 leads downward along its entire length, not upward.  Scheuermann also does not disclose this limitation because the cable guide includes a bottom surface with a generally flat portion adjacent the cable duct that tapers *downward* as it extends away from the cable duct.  A539.

## PANDUIT'S APPEAL

## SUMMARY OF ARGUMENT

Panduit cannot propose new rejections on appeal to the Board, and it was proper for the Board to refuse to consider such new proposals.

The Board's refusal to adopt additional rejections should also be affirmed. Panduit's interpretation of the Long reference was not disclosed in Long, was supported only by attorney argument, does not disclose critical limitations of the claims, and was properly rejected by the Board.

The other references relied on by Panduit are discussed in the Statement of Facts above and arguments below. These references exemplify the type of teaching that the '220 inventors went against in developing a new cable exit trough that: defines a cable exit pathway that routes cables upwardly and then over the top edge of the trough section's sidewall; and is mountable to the trough section without modifying the trough.

Finally, the Board was correct that dependent claim 26 is not indefinite. The language of claim 26 closely tracks the language of claim 14 and is not insoluably ambiguous.

# ARGUMENT

# STANDARD OF REVIEW

The standard of review for Panduit's appeal is the same as it is for ADC's Cross-Appeal, discussed *supra*.

# I.

# THE BOARD CORRECTLY FOUND THAT PANDUIT'S PROPOSED REJECTIONS TO CLAIMS 17–20 AND 22–25 WERE NOT APPEALABLE

The Board correctly refused to consider Panduit's proposed rejections of claims 17–20 and 22–25 on the grounds that (1) they were not listed in the Right of Appeal Notice ("RAN") and (2) they were new grounds of rejection that were barred by 37 C.F.R. § 41.67(c)(vi).  A95-97.

**A.    The Board Correctly Held that Rule 41.67 Bars Panduit's Proposed Rejections**

**1.    Rule 41.67 prohibits new proposed rejections on appeal**

The PTO rules provide that, except in a few circumstances, a requester's appeal to the Board may not raise new grounds of rejection:

> No new ground of rejection can be proposed by a third party requester appellant, unless such ground was withdrawn by the examiner during the prosecution of the proceeding, and the third party requester has not yet had an opportunity to propose it as a third party requester proposed ground of rejection.

37 C.F.R. § 41.67(c)(vi).

49

Panduit never proposed to the Examiner any specific rejections of claims 17-20 and 22-25. The first time Panduit alleged any statutory basis for invalidity of these claims was in its appeal to the Board. Panduit does not deny this in its brief to this Court.

None of the exceptions in Rule 41.67 apply here. Panduit's invalidity arguments regarding claims 17–20 and 22–25 are not ones that the Examiner had withdrawn during the reexamination proceeding. Moreover, Panduit had opportunities to propose its rejections to claims 17–20 and 22–25 to the Examiner. Following ADC's amendment adding new claims 17–26, Panduit filed a reply in which Panduit could have, but did not propose any specific rejections to the newly added claims. *See* A414-441.

Panduit's second opportunity came after the Examiner issued the ACP. The ACP did not discuss claims 17–20 and 22–25 in the section titled "Rejections Proposed by Requester – NOT Adopted," thereby putting Panduit on notice that the Examiner did not believe Panduit had raised any proposed rejections with respect to these claims. *See* 394–99. Knowing that a RAN would soon follow that would frame the issues to be taken up by the Board on appeal, Panduit took no action regarding claims 17–20 and 22–25 despite having the opportunity to do so. For example, Panduit could have petitioned under 37 C.F.R. §§ 1.181 and/or 1.183 to include some proposed specific rejections of claims 17–20 and 22–25 in the

50

ACP and/or the RAN. *See Belkin Int'l, Inc. v. Kappos*, No. 2012-1090, 2012 U.S. App. LEXIS 20545 at *16 (Fed. Cir. Oct. 2, 2012) (finding requesters "proper course of action" was by way of petition).

On appeal, the Board made a finding that "Panduit did not expressly include a statement of a proposed ground of rejection of claims 17–20 and 22–25." A95. Panduit does not, and cannot, dispute these findings. Accordingly, the Board correctly held that the newly proposed rejections constitute new grounds under § 41.67(c)(vi) and therefore were not properly before to the Board on appeal.

### 2. The Rules require a Requester to specifically propose rejections that it wants to be considered

Recognizing that it never proposed any rejections of claims 17–20 or 22–25 to the Examiner, Panduit argues that a requester need not assert specific rejections for new claims added during reexamination because neither 35 U.S.C. § 314(b)(2) nor 37 C.F.R. § 1.947 specifically requires it. Panduit Brief, pp. 26–28. Panduit's argument is not accurate and proves nothing. While these provisions do not delineate the content of the requester's response, they certainly do not negate other rules that expressly prohibit Panduit from raising newly proposed rejections on appeal that it chose not to make to the Examiner, including the above-mentioned Rule 41.67.

Moreover, Panduit's argument conflicts with other requirements in the *inter partes* rules regarding a requester's obligation to propose rejections. For example,

51

37 C.F.R. § 1.915(b)(3) provides that a request for *inter partes* reexamination must include "a ***detailed explanation*** of the pertinency and manner of applying the patents and printed publications to every claim for which reexamination is requested (emphasis added)."  MPEP § 2617 explains what a "detailed explanation" entails:

> The mere citation of new patents or printed publications without an explanation does not comply with 37 CFR 1.915(b)(3). Requester should present *an explanation of how* the cited patents or printed publications are *applied* to all claims which the requester considers to merit reexamination based on patents or printed publications.
>
> ***
>
> For proposed obviousness rejections, requester **must provide** at least one **>basis for combining<** the cited references, and a statement of why the claim(s) under reexamination would have been obvious over the proposed reference combination. . . . The explanation **must not** lump together the proposed rejections or proposed combinations of references.

The MPEP then provides examples of "inappropriate" and "appropriate" language. MPEP § 2617.  Notably, *both* examples include citations to the statutory basis for the proposed rejection for a specific claim and an identification of the prior art relied on.  *Id.*  This is shown as the absolute bare minimum that must be specified to advance a proposed rejection.  It would be nonsensical to require this type of showing in order to initiate an *inter partes* reexamination while having no

requirement at all to propose any rejection of new claims that are added during

reexamination.

Panduit's argument also conflicts with what is required of a requester when

a patent owner amends claims during reexamination. MPEP § 2666.05(II)

provides that the third party requester can submit new prior art and propose a new

rejection "where such new proposed rejection is necessitated by patent owner's

amendment of the claims." *See also* 37 C.F.R. § 1.948(a)(2). In this instance, the

MPEP specifies that:

> [T]he third party requester must present the newly
> proposed rejection ***in compliance with the guidelines set
> forth in MPEP § 2617***, since any such new proposed
> rejection stands on the same footing as a proposed
> rejection presented with the request for reexamination,
> and ***is treated the same way as to future Office actions
> and any appeal***. . . . ***An explanation pursuant to the
> requirements of 35 U.S.C. 311 of how the art is applied
> is no less important at this stage of the prosecution,
> than it is when filing the request***.

MPEP § 2666.05(II) (emphasis added). It is nonsensical for Panduit to argue that

it had no obligation to propose any specific rejection of newly added claims when

there is an obligation to propose specific rejections when claims are amended.

### 3. Panduit's proposed rejections of claims 17–20 and 22–25 were not "easily discernible" from its submission to the Examiner

Panduit asserts that the bases for its challenges to new claims 17–20 and 22–

25 were "easily discernible" from its submission to the Examiner. Panduit Brief,

p. 25.  Panduit's entire discussion of claims 17 and 22 before the Examiner consisted of two summary sentences, and its discussion regarding claims 18–20 and 23–25 was a single paragraph.  A438–39 (Panduit's Reply, pp. 25–26).  Importantly, not a single specific statutory rejection is provided for any of claims 17–20 or 22–25, nor is there any detailed explanation of how the references are applied to the claims.  *See id.*  The exhibits that are referenced  on pages 25–26 of Panduit's submission do not show how the specific limitations of claims 17–20 and 22–25 are disclosed in the prior art references shown in those exhibits.  Moreover, Panduit's submission provides no basis for combining any of the references to support an obviousness rejection and says nothing about why any claim would have been obvious over the proposed combination.  *See* MPEP § 2617.  Given these deficiencies, Panduit cannot credibly argue that the newly proposed "rejections" of claims 17–20 and 22–25 were "easily discernible" from pages 25–26 of Panduit's Reply.

The Examiner did not believe Panduit's proposed rejections were "easily discernible."  Neither the ACP nor the RAN listed any of Panduit's proposed rejections to claims 17–20 and 22–25 in the sections addressing rejections proposed by the Requester.  *See* A378-82; A394-404.  Moreover, the Examiner specifically stated that Panduit's proposed rejections for claims 17–20 and 22–25 had not previously been proposed, and thus were not proper for appeal.  A228.

**B.    The Board Correctly Found That Panduit's Proposed Rejections Of Claims 17–20 and 22–25 Were Not Appealable Because They Were Not Included in the RAN**

While this Court reviews whether the Board possessed jurisdiction *de novo*, the Court affords "substantial deference to the PTO's interpretation of its own regulations." *Belkin Int'l*, 2012 U.S. App. LEXIS 20545 at *4–5.

Panduit argues that 35 U.S.C. § 134(c) and 37 C.F.R. § 41.61 broadly permit a party to appeal to the Board any final decision favorable to patentability.  Panduit Brief, p. 28–30.  This argument misses the point.  While the statute and the rule may permit such an appeal, Rule 41.61 further sets forth the *procedures* that a party must follow in order to appeal.  Panduit does not challenge whether the PTO's Rule 41.61 was properly promulgated by the PTO.[1]  The only issue, then, relates to the Board's interpretation and application of its rule, which as mentioned above is entitled to substantial deference.

**1.    The Board's interpretation of its rule governing how issues are preserved for appeal is reasonable and entitled to deference**

The Board's interpretation and application of Rule 41.61 was reasonable based on the language of the rule and the procedural concerns of the PTO.  The statute that Panduit cites, 35 U.S.C. § 134(c), merely sets forth (1) where a third

---

[1] Rule 41.61 was properly promulgated by the PTO as it merely governs "the conduct of proceedings in the Office" and does not change existing substantive patent law.  *See Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1335–36 (Fed. Cir. 2008); 35 U.S.C. § 2(b)(2).

55

party requester must take an appeal—i.e., to the Board, and (2) which decisions of an examiner are appealable—i.e., final decisions of an examiner favorable to patentability. The statute is silent with respect to the procedures that a party must follow in order to proceed with its appeal. The PTO promulgated Rule 41.61 to fill in this procedural gap. Among other things, Rule 41.61(d) states that an appeal must be taken "from all the determinations favorable to patentability, including any final determination not to make a proposed rejection, in a Right of Appeal Notice which a requester proposes to contest." Thus, as the Board found, the Rule provides that the RAN frames the issues for appeal to the Board. A96. To the extent Rule 41.61 is at all ambiguous, the Board's interpretation of this procedural rule controls. *Eli Lilly*, 334 F.3d at 1266 (an agency's interpretation of its own regulation afforded "substantial deference").

In this case, the Board held, and it is undisputed, that "the Examiner did not include claims 17–20 and 22–25 in the statement of the non-adopted rejections in the Right of Appeal Notice." A96. Accordingly, the Board did not err in finding that the newly proposed rejections of claims 17–20 and 22–25 raised for the first time in Panduit's Notice of Cross-Appeal and Appeal Brief to the Board were "not appealable." *Id.* Again, as correctly stated by the Board, "[t]o the extent Panduit viewed the Examiner's ACP and RAN as inappropriately excluding reference to

56

certain prior art rejections, Panduit's remedy was by way of a timely-filed petition." *Id.; see Belkin Int'l*, 2012 U.S. App. LEXIS 20545 at *11, 16.

## 2.    Panduit's interpretation of Rule 41.61 is incorrect and contrary to other PTO rules and procedure

Panduit argues that because 37 C.F.R. § 41.61(a)(2) and (d) include the clause "including any final determination not to make a proposed rejection," the preceding language "any final decision favorable to the patentability" must be interpreted broadly to mean that the requester can raise any issue that relates to patentability on appeal, regardless of whether a specific rejection was previously proposed at all. Accepting Panduit's argument would be the equivalent of rewriting the "including" clause to state, "including any final determination not to make a proposed *or un-proposed* rejection." Such an interpretation does not make sense and reads the word "proposed" out of the regulation altogether.

In addition, 37 C.F.R. § 1.953(c) sets forth the contents of the RAN in an *inter partes* reexamination:

> (c) The Right of Appeal Notice shall be a final action, which comprises a final rejection setting forth each ground of rejection and/or final decision favorable to patentability including each determination not to make a proposed rejection, an identification of the status of each claim, and the reasons for decisions favorable to patentability and/or the grounds of rejection for each claim.

MPEP § 2673.02 further states:

Any grounds of rejection and findings of patentability relied upon should be restated in the RAN. ***The reasons for each rejection and finding should be set forth in detail. The grounds of rejection and findings of patentability should, at this point, be clearly developed to such an extent that the patent owner and the third party requester may readily judge the advisability of filing an appeal*** (emphasis added).

If Panduit's argument was correct and a requester could raise any and all possible rejections on appeal to the Board, regardless whether the rejections were previously proposed during prosecution, there would be no point to § 1.953(c) that sets forth in detail what the RAN shall comprise. The regulations and MPEP commentary were purposeful—to discretely frame the issues that can be raised on appeal to the Board.

## II.

## THE BOARD CORRECTLY REVERSED
## THE EXAMINER'S SECTION 103 REJECTION OF CLAIMS 1-9, 12-13
## AND 18-21 BASED ON LONG IN VIEW OF STABER,

## AND

## THE BOARD CORRECTLY AFFIRMED
## THE EXAMINER'S REFUSAL TO ADOPT THE PROPOSED SECTION
## 102 REJECTION OF CLAIMS 1, 10 AND 14-16 BASED ON LONG

**A.    The Board Properly Construed the Term Exit Trough to Require an Open Channel**

The Board interpreted the term "trough" to mean a long, narrow open receptacle.  A69-70.  The Board found that there was no evidence that Long's guide means was open at one side as required in the claims.  A88.

Panduit asserts that the Board's interpretation requiring the trough to be "open" is inconsistent with the disclosure in the '220 patent as well as a dictionary definition that Panduit supplies.[2]  Panduit's arguments lack merit.

Regarding the alleged inconsistency with the '220 patent, the only argument that Panduit makes is that the disclosed exit troughs include "lead-ins 124, 134, 224, 234 that cause at least part of the cable trough to be enclosed."  Panduit Brief, p. 33.  The lead-ins, 124 and 134, are shown below in FIGS. 1 and 5 from the '220 patent.  A3; A7.

---

[2] Panduit also disputes the portion of the Board's interpretation that a trough be "long."  However, the Board did not rely on this portion of the interpretation in arriving at its conclusion that Long lacked a cable exit "trough."



The exit trough is open (i.e., not completely enclosed) even with the lead-ins. As shown in FIG. 1 above, the exit trough defines a cable exit pathway 152 that is open along the entire length of the exit trough, including the portion of the cable exit pathway between the lead-ins. Recognizing that, Panduit only asserts that the lead-ins enclose "part of" the cable exit trough. However, the lead-ins themselves are not even enclosed. Each lead-in defines a lead-in pathway (e.g., lead-in 124 defines lead-in pathway 130) that is surrounded on only three sides with the fourth side open. A20 (col. 3:34-39). The bottom of the lead-in 124 is open along the entire length of the lead-in pathway 130 defined by the lead-in. See annotations in drawings above. There is no such opening in Long's device.

Panduit's second argument -- that the Board's claim interpretation conflicts with Panduit's dictionary definition - lacks merit for several reasons. First, the dictionary definition was not in the record before the Examiner. The first time that

Panduit mentioned this dictionary definition was in its request for rehearing that it filed *after* the Board's ruling.  A56 (see footnote 5 in which Panduit admits that its proposed definition "was not previously of record").  Second, Panduit's proposed definition is for a phrase ("cable trough") that is different from the claim language. The claim recites a "cable exit trough," and the Board interpreted the word "trough."  Finally, Panduit's proposed definition does not cover the embodiments disclosed in the '220 patent.  Panduit's proposed definition requires an "enclosed channel," which would necessarily exclude open channels.  However, none of the exit troughs in the '220 patent are enclosed.  Rather, every embodiment of an exit trough that is shown in the '220 patent has an opening along its length.  That opening allows an operator to place or remove cables from the cable exit trough. Whereas the Board's definition (requiring an "open" channel) covers the disclosed patented embodiments, Panduit's does not, and thus should be rejected.

**B.    Panduit's Discussion Regarding its Drawings is Misguided and Erroneous**

> **1.    The Accuracy of Panduit's Drawings Was Not Addressed in the Board's Decision**

Panduit devotes several pages in its brief to discussing drawings (referred to as FIGS. A-D) that purport to disclose features on Long's funnel-shaped part 5. Panduit Brief, pp. 34-37.  Panduit explains that there are two features of the Long funnel-shaped part, namely the opening and the flared portions at the bottom, that

one of skill in the art would infer from Long's disclosure. Panduit based its invalidity arguments regarding Long on the features shown in its drawings (as opposed to the actual figures and written disclosure of Long).

The Board did not base its decision on whether those drawings are accurate. The Board interpreted the term "trough" to require an open receptacle, and found that there is no evidence in the record that Long's guide means (i.e., the funnel-shaped part) is open along one side. A69-70. Because the only evidence that Panduit put forth regarding Long's disclosure was Panduit's drawings, the Board noted that even Panduit's own drawings of Long show it as being enclosed, and thus not a trough as claimed. A88; A92. In other words, even assuming that Panduit's drawings were accurate the Board found that there was no evidence that Long disclosed a cable exit trough.

### 2. Panduit's Drawings Are Not Supported By the Disclosure of Long

Had the Board's decision turned on the accuracy of Panduit's drawings, the Board would have found that there is no evidence that Long discloses the structure in Panduit's drawings.

It is undisputed that Panduit's drawings (provided below, right side) are not specifically shown or described in Long. Long FIG. 2 (provided below, left side) is the only relevant figure.

**FIG. 2 of Long**

**Panduit's interpretation of Long**

Panduit added:

a) the opening through the center of part 5, and

b) curved surfaces labeled (1) that flare outward toward the bottom end of part 5





Element 5 is referred to in the Long specification as a "funnel-shaped part". A528 (col. 2:20-21). The bottom end of the funnel-shaped part is shown (in FIG. 2) to have straight walls, and is described as "a substantially straight end". The top end is shown and described as flaring outward, following the curvature of the guide elements (3 and 6), resulting in a shape that is wider at the top than at the bottom (similar to the outer contours of a funnel, i.e., "funnel-shaped"). Unlike FIG. 2 of Long, Panduit's drawn structure includes (1) an opening extending through it and (2) curved walls (shaded orange in the drawing) that flare outwardly at the bottom of the structure. These two features are not shown in Long's FIG. 2 or otherwise discussed in Long.

63

Panduit asserts that these two structural features, that it admittedly added to its drawings, are either expressly described or necessarily inferred from the Long disclosure.  This is wrong for multiple reasons.

First, Panduit's drawings conflict with specific teachings in Long.  Long discloses that the funnel-shaped part 5 has a "substantially straight end" and "flare end".  A528 (col. 1:35-41).  These two ends are identified below in FIG. 2 of Long.



Long (Fig. 2)

In contrast, Panduit's drawings depict the funnel-shaped part with *two* flared ends.  The green surfaces flare outward at the top and the orange surfaces flare outward at the bottom.  *See* annotations below to Panduit's drawings.  Neither end is substantially straight.

**Contrary to Long's disclosure, Panduit's interpretation of Long has <u>two</u> flared ends.**



**Flared at this end…**

**…and at this end**

FIG. B

In addition, Long teaches that the guiding device (which includes funnel-shaped part 5) "widens in the direction of exit."  A528 (col. 1:49).  In contrast, the curved orange surfaces on Panduit's drawings curve toward each other as they extend from the bottom of the duct in the direction of the duct exit.  As a result, the device *narrows* (at least in one dimension) in the direction of the exit.

Second, Panduit's structure is not funnel-shaped.  The reference to part (5) in Long as being "funnel-shaped" merely refers to the tapered or "flared" outer ends *pictured in FIG. 2* of Long.  Part (5) has curved ends that follow the curvature of guide elements (3 and 6), and the resulting shape is wider at its top than at its bottom (like the outer contours of a funnel).  Requester's proposed structure does not do that.  In a first dimension, it is wider at the top than at the bottom, but in another dimension it is wider at the bottom than at the top.

Panduit erroneously argues that something is funnel shaped so long as it tapers and includes an opening.  Panduit Brief, p. 35.  Panduit refers to dictionary

65

definitions of the term "funnel" to support its argument. However, the disclosed element in Long is referred to as a "funnel-shaped part," not a "funnel." Part (5) is funnel-shaped because its outer surface flares outwardly at the exit of the duct. Whereas a funnel would have an opening extending through it, that is not required for something to be "funnel-shaped." It is the absence of an opening that explains why Long only refers to part 5 as "funnel-shaped" and says that funnel-shaped part 5 "encloses the exit opening". A part that "encloses the exit opening" would ***not*** have an opening through it (which Panduit's drawing has), which would explain why part 5 is described as "funnel-shaped", and not a "funnel".

Third, there is no evidence that Panduit's drawn structure absolutely prevents bending below a minimum bend radius. Panduit cites to portions of Long in which Long explains that the guiding device/means prevents or absolutely prevents bending of cables below a minimum bend radius. Panduit Brief, p. 31. However, there is no evidence how Panduit's structure would perform in the real world or that it would necessarily or absolutely prevent problematic over bending of fibers. All Panduit offers is attorney argument. In fact, as ADC explained during the hearing to the Board (A142), Panduit's structure has sharp edges at the top and the bottom which are within duct that could cause over bending of cables routed adjacent those edges. *See* annotated drawings below. Thus, Panduit's own

66

structure does not "absolutely" prevent bending of cables beyond a minimum bend radius as Long's disclosure describes.



Sharp edge inside the cable duct

Sharp edge inside the cable duct

Fourth, Panduit's argument is not supported by any testimony from a skilled artisan. According to Panduit, one skilled in the art would infer from Long's disclosure that the bottom of the funnel shaped part must be curved. Panduit Brief, p. 37. However, there is no evidence in the record from one skilled in the art that he or she would make such an inference.

### 3. Panduit's Drawings Fail to Disclose Multiple Claim Elements

Panduit's invalidity arguments fail even if Panduit's drawings were accurate. With respect to Panduit's proposed anticipation rejection of claims 1, 10 and 14-16,

Panduit's drawings lack several claim limitations. For example, regarding claims 1 and 10 Panduit's drawings do not show (1) an exit pathway that extends "over the top edge of the first trough section so that cable can be routed upwardly from the first trough section, over the top edge of the first trough section and then in a downward direction as it exits the cable exit trough" or (2) an exit trough that is "releasably mountable" to a trough section "without modifying." *See* A243-44 (pages 15-16 of ADC's appeal brief to the Board ). Regarding claims 14-16, Panduit's drawings do not disclose (1) a "cable exit pathway that leads over the upstanding side," or (2) a "side wall surface having a curved portion leading from a direction generally parallel to the cable pathway toward a direction generally perpendicular to the cable pathway." *See* A245 (page 17 of ADC's appeal brief to the Board).

With respect to Panduit's proposed obviousness rejection (Long plus Staber), there are multiple claim limitations that are not shown in Panduit's drawings or in Staber. For example, neither discloses (1) an exit trough that is releasably mountable to a first trough section "without modifying the first trough section" or (2) a cable exit surface that curves "from a substantially vertical orientation to at least a substantially horizontal orientation." *See* A318 and A320-21 (pages 35 and 37-38 of ADC appeal brief to the Board).

## C.    ADC's Drawings Do Not Render the Claims Invalid

Panduit next argues that the Board erred by failing to consider its argument that ADC's own drawings anticipate claims 1, 10 and 14-16. As set forth below, ADC's drawings are not prior art, and even if they were they lack several claimed features.

## 1.    ADC's Drawings are Not Prior Art

For a statement by a patent applicant to constitute an admission of prior art, it must literally identify something as prior art or clearly demonstrate actual knowledge of specific prior art. *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003). For example, labeling patent drawings as "prior art" or submitting Jepson-style claims. *See e.g.*, *In re Fout,* 675 F.2d 297, 301 (C.C.P.A. 1982); *In re Nomiya,* 509 F.2d 566, 571 (C.C.P.A. 1975). Absent such types of express statements, Courts otherwise are reluctant to find that there has been an admission of prior art.

ADC's submission of its drawings is not an admission that they are prior art. ADC did not label or otherwise expressly assert that they are prior art. Instead, ADC merely gave an *ex post* example of structure that would be more *consistent* with the teaching of Long than the structure shown in the drawings submitted by Panduit (i.e., FIGS. A-D). A240-41. Moreover, ADC's counsel expressly stated to the Board that Long does not show or disclose what was provided in ADC's drawings. A178 ("We don't say that ours is right and ours is disclosed in Long.

69

That was not the point of that.  It was just to say, hey, here's another plausible explanation one skilled in the art could come up with.  But there's nothing in Long that shows this.").

### 2.    ADC's Drawings Lack Several Claim Elements

Even if ADC's drawings are prior art, they do not anticipate any of claims 1, 10 or 14-16.

Regarding claims 1 and 10, ADC's drawings do not disclose:  (1) a "cable exit surface and side walls extending therefrom to define a cable exit pathway" with the cable exit pathway "extending over the top edge of the first trough section"; (2) a curved cable exit surface having "an upwardly curved portion extending from within the first trough section"; and (3) a curved cable exit surface with a "downwardly curved portion extending out of the first trough section."

Regarding (1), the structure that Panduit labels as the curved cable exit surface is merely a single curved surface on the duct that flares outwardly.  The surfaces that Panduit labels as the first and second sidewalls are on the separate insert piece that is positioned within the duct.  These two alleged sidewalls (on the insert) do not cooperate with the alleged curved bottom surface (on the duct) to define a cable exit pathway.  Panduit does not identify where there is an exit pathway extending over the top edge that is defined by these three surfaces, i.e., the cable exit surface and two side walls.

70

Regarding (2) and (3), the duct in Long is vertical.  See Fig. 2 of Long showing duct (2') oriented along the side of panel 10 and the cables suspended in the middle of the duct.  A527. Consistent with Long's disclosure, ADC's drawings show the duct in a ***vertical*** orientation.  A241 (Respondent's Brief, dated July 6, 2010, p 9).  To support its anticipation argument, Panduit has rotated the ADC drawings (and ignored the Long disclosure) to depict the duct in a horizontal orientation.  See Panduit Brief, p. 39.  Even if ADC's drawings were prior art, Panduit cannot change ADC's drawings (by rotating them) and then declare that Panduit's modifications to the drawings are now also prior art.

When the Long's duct is oriented in its proper vertical orientation (as shown in ADC's drawings), the surfaces that Panduit labels in its brief are ***not*** curved in the manner recited in the claims.  The surface that Panduit labels as "Upwardly Curved Portion" actually curves in a horizontal direction away from the duct, not upwardly as recited in the claims.  Similarly, the surface that Panduit labels as the "Downwardly Curved Portion" curves in an outward horizontal (not downward) direction.

Further regarding (2), the claim recites that the upwardly curved portion extends "from within the first trough section."  The surface that Panduit labels as the "Upwardly Curved Portion" (on its annotations to ADC's drawings) does not extend into the duct.  Panduit's annotations to ADC's drawings show the upwardly

curved portion beginning at the top edge and leading away from it.  See *Panduit Brief*, p. 39.

Regarding claims 14-16, ADC's drawings lack the following claim limitations:  (1) a bottom surface and side walls surfaces that define a cable exit pathway that "leads over the upstanding side of the first trough section"; (2) a bottom surface having "a first curved portion leading upwardly with respect to the first trough section"; and (3) a bottom surface with a "second curved portion extending downwardly with respect to the first trough section."  These claim limitations are missing for the same reasons discussed above for claim 1.

## D.    The Board Correctly Found that the Device in Panduit's drawings is Completely Enclosed

Panduit also argues that Board incorrectly found that the structure in Panduit's drawings is completely enclosed because its structure has a central opening through it.  *Panduit Brief*, p. 40.

Panduit misses the point of what the Board said.  By saying that the structure in Panduit's device is completely enclosed, the Board meant that there is not an opening along the length of the structure.  Instead, Panduit's structure has solid surfaces along each side that extend between the ends, and thus it is completely enclosed like a tube.  This is in contrast to a trough, such as shown in the '220 patent, which has an opening along at least one side.  Because Panduit's structure lacks such an opening it is merely a tube or tunnel, but not a trough.

## III.

### THE BOARD CORRECTLY AFFIRMED THE EXAMINER'S REFUSAL TO ADOPT THE PROPOSED SECTION 102 REJECTION OF CLAIMS 1-10, 12 AND 13 BASED ON MEYERHOEFER

The Board concluded that Meyerhoefer did not anticipate any of these claims because it did not disclose a cable exit trough with a "cable exit pathway extending over the top edge of the first trough section." A91-92. The Board found that the Meyerhoefer device 20 is mounted on (and provides a pathway over) an edge that is beneath the top edge of the duct. A92.

#### A.    The Board Correctly Found that Meyerhoefer Fails to Disclose an "exit pathway extending over the top edge of the first trough section"

Panduit first asserts that the Board incorrectly interpreted the term "top edge." According to Panduit, a "top edge" is any edge that faces the top. Panduit Brief, p. 41. Second, Panduit asserts that even under the Board's interpretation of top edge, Meyerhoefer discloses a cable pathway extending over the top edge. Neither argument is correct.

As the Board found, Panduit's proposed interpretation of "top edge" cannot be correct because it ignores the word "top." A92. The claim does not merely recite that the exit pathway extends over some edge that faces upward regardless of where it is in relation to the other portions of the trough. Instead the edge must be a "top edge." The top edge is the uppermost edge on the lateral trough section.

Under Panduit's definition, a top edge could include an edge formed at the very bottom of a device, such as the edge 10 in Meyerhoefer.

Panduit asserts that its proposed interpretation of top edge (any edge that faces the top) does not ignore the word "top." According to Panduit, the word "top" operates to distinguish the term "top edge" from other types of edges, such as side edges or bottom edges. Panduit Brief, p. 42.

The problem with Panduit's argument is that it erroneously reads the term "top edge" in a vacuum, without regard to the other language in the claim. *See Quantum Corp. v. Rodime PLC*, 65 F.3d 1577, 1581 (Fed. Cir. 1995) (stating that claim limitations must be interpreted as a whole, in context). The relevant claim language recites a cable exit pathway that extends "over the top edge." A443. The only edge that a cable pathway can extend "over" is one that faces upward. The other types of edges that Panduit identifies (i.e., side and bottom edges labeled in the drawing on page 42 of Panduit's brief) would not be examples of edges that a cable pathway would extend "over." Rather, a cable pathway would be said to go *around* a side edge and *under* a bottom edge. Since the only edge that a cable pathway can go "over" is one that faces upward, Panduit's interpretation of top edge would improperly render the word "top" meaningless. In other words, if Panduit's interpretation of "top edge" were adopted the recitation of a cable pathway extending "over the edge" would have the same scope as the recitation of

a cable pathway extending "over the top edge".  *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction which would render a claim limitation meaningless); *Bicon, Inc. v. Straumann Co*., 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").  In contrast, the Board's interpretation of "top edge" (i.e., the uppermost edge) gives meaning to the word "top".

Panduit's second argument (Meyerhoefer discloses the top edge feature even under the Board's interpretation) is also incorrect.  The term lateral trough section refers to a length (i.e., section) of lateral trough.  For example, the '220 patent refers to element 20 in the drawings as a lateral trough section.  A19 (col. 2:50). Contrary to what Panduit argues, a lateral trough section is not any randomly-selected surface or portion on a lateral trough, such as the small lip on the Meyerhoefer duct sidewall that Panduit has shaded in its brief.  See Panduit Brief, p. 43.  While the edge that Panduit identifies may be at the top of that lip, it is not the top edge of the duct (i.e., lateral trough section).  In fact, the edge (i.e., edge 10) that Panduit relies on is located at the bottom of the Meyerhoefer duct side wall directly beneath another edge, i.e., edge 16, that is at the top of the duct section. A541.  The Meyerhoefer device fits within the slot formed below that top (uppermost) edge, and provides a pathway beneath that top edge, not over it as required in the claims.

75

Panduit's second argument also gives the "top edge" language no meaning. Under Panduit's analysis, every edge of a trough, regardless of where is located on the trough, could be the uppermost (i.e., top) edge by simply defining the lateral trough "section" as only the structure on the trough that is below that edge. The Board recognized this when it characterized Panduit's argument as simply drawing a box around the edge 10 and ignoring everything else in Meyerhoefer's structure. A36.

## B.    Meyerhoefer Lacks Other Limitations in the Disputed Claims

There are other limitations, that the Board did not address, that also are absent in Meyerhoefer. For example, Meyerhoefer lacks a curved cable exit surface having "an upwardly curved portion extending from within the first trough section." No portion of the Meyerhoefer device leads upwardly from a position within the duct. The Examiner found that this limitation was not disclosed in Meyerhoefer. A394-95.

Meyerhoefer also does not disclose "first and second transition surfaces to gradually transition cables from the first trough to the cable exit trough" as recited in dependent claim 10. The surfaces (40) on Meyerhoefer's device begin perpendicular to the channel and then curve outwardly away from the channel. Since the surfaces (40) do not extend into the channel, they do not operate to transition cable from within channel to the device 20.

## IV.

## THE BOARD CORRECTLY AFFIRMED
## THE EXAMINER'S REFUSAL TO ADOPT THE PROPOSED SECTION
## 103 REJECTION OF CLAIMS 1, 10 AND 14 BASED ON SCHEUERMANN

**A.     The Board Correctly Found that Scheuermann Fails to Disclose an "upwardly curved portion" in Claims 1 and 10 and a "first curved portion leading upwardly" in Claim 14**

Panduit asserts that the disclosure in Scheuermann as a whole shows that the bottom wall 8 on the Scheuermann device has an upwardly curved portion as recited in the claims. In support, Panduit relies on FIG. 1 and specific phrases from the written description regarding the bottom wall 8. These are the same arguments that the Board considered and rejected in its Decision on Appeal and in its Decision on Rehearing. *See* A93-94; A33. According to the Board, nothing in Scheuermann established that the bottom surface (8) curved upwardly, and Panduit had not provided any evidence (e.g., expert testimony) that supported its reading of Scheuermann. *Id*.

There was ample reason for the Board to reject Panduit's argument. First, Scheuermann consistently describes surface 8 as curving "downward," and never refers to the surface curving upward. A537 (line 11); A536 (line 23); A538 (line 5). Second, the Figures in Scheuermann only show bottom surface 8 curving downward.

77

Panduit argues that the bottom wall 8 has an upwardly curved portion. Panduit relies heavily on the phrase "from the bottom of the cable duct over the unslotted area of the side walls" in Scheuermann's disclosure. According to Panduit, for the curved wall 8 to bend "from the bottom" of the duct and pass "over the unslotted area of the side walls", the wall 8 must curve upwardly inside the cable duct. Panduit Brief, p. 47.

The problem with Panduit's argument is that it omits part of the quote from Scheuermann's disclosure. Panduit claims that Scheuermann discloses that the wall 8 is bent "from the bottom ...." However, Scheuermann actually says that the wall 8 is bent "***downward*** from the bottom." A536 (line 23)(emphasis added). Thus, not only does the disclosure lack any explicit teaching of an upwardly curved portion (as the Board found), but it in fact explicitly says that the bottom wall 8 bends "downward". To give this language its clear meaning, the Board interpreted the "bottom" of the duct to include the narrow unslotted portion on the sidewall over which the Scheuermann cable guide is positioned. A33. Figure 1 of Scheuermann clearly shows the bottom wall 8 bending downward from the narrow unslotted portion of the duct sidewall. A539.

Panduit next argues that Scheuermann's Figure 1 shows that the curved bottom wall 8 has an upwardly curved portion. Panduit Brief, p. 48. Panduit has highlighted (in blue) an arbitrary portion of the bottom wall and concluded, based

78

solely on its position relative to the cables, the blue-highlighted portion is within the duct and curves upwardly. There is no evidence that the blue-highlighted area is part of the bottom wall 8, much less that it is positioned within the duct. Moreover, Panduit's assertion regarding Figure 1 conflicts with Scheuermann's disclosure which only describes the bottom surface as bending "downward." A536.

On page 49 of its brief, Panduit erroneously argues that the Board adopted two configurations of Scheuermann's bottom wall 8. Regarding the drawing on the left, there is no mention in the Board's decision about a configuration with an edge sticking into the duct (as is shown in the drawing in Panduit's brief). Likewise, the Board did not adopt the drawing on the right, but merely stated that if Scheuermann required the bottom wall 8 to contact the bottommost surface of the duct (which Scheuermann does not), there are possible configurations of the bottom wall inside the duct, other than the upwardly curved configuration that Panduit asserts. A33.

Panduit's criticism of these two configurations ignores the fact that Panduit's own proposed configuration of Scheuermann (with the bottom wall having an upwardly curved surface) introduces sharp edges into the cable pathway. In particular, there would be a sharp edge along each side of the bottom wall that faces the cables being routed through the duct.

**B.    Scheuermann Lacks Other Limitations in the Disputed Claims**

There are other limitations, that the Board did not address, that also are absent in Scheuermann.  Regarding claims 1 and 10, Scheuermann does not disclose:  (1)  mounting an exit trough  "without modifying" the first trough section; (2) a first trough section with an upstanding side of "substantially uniform height"; or (3) an exit pathway "extending over the top edge of the first trough section."

Regarding (1) as seen in FIG. 1 of Scheuermann, the side walls (2) of the cable duct have been modified by cutting the side wall to form slots (3).



*Fig. 1*

Scheuermann also teaches that to mount the cable guide part, the user ***must break off*** several tongues of the side wall.   A537(lines 6–9).

Regarding (2), because slots have been cut into the side wall of the channel member, the side wall does not have a substantially uniform height.

Regarding (3), because Scheuermann cuts slots into the side walls and also breaks off a portion of the side wall before inserting the cable guide device, the cable guide device provides a pathway for routing cables through the slots formed in the side walls, not over them. The Examiner agreed that Scheuermann does not disclose this claim limitation. A379; A396-97.

Regarding claim 14, Scheuermann does not disclose a "cable exit pathway that leads over the upstanding side of the first trough section" or a trough sidewall with a "substantially uniform height." As explained above, Scheuermann's guiding device forms a cable pathway that extends <u>through a slot</u> cut in the side of a duct so that the exit pathway passes through the side, not over it.

Scheuermann also lacks the limitation in claim 14 that an exit trough have "an upper surface positioned above and at least partially facing a bottom of the first trough section" when mounted to the first trough section. See discussion in Section II(B)(2) of ADC's appeal (above) explaining how Scheuermann fails to disclose this claim limitation.

## V.

### <u>THE BOARD CORRECTLY REVERSED THE EXAMINER'S REJECTION OF CLAIM 26 UNDER 35 U.S.C. §112, ¶2</u>

The Board reversed the Examiner's rejection of claim 26. The Board explained that because the claim language is identical in claims 14 and 26, one of skill in the art would understand that that the recited "first curved portion" in these claims refers to the same structure. A89.

### A.    The Showing Required to Satisfy the Definiteness Requirement is Low

The standard for satisfying the definiteness requirement in 35 U.S.C. §112, ¶ 2 is relatively low. *Finisar Corp., v. DirecTV Group, Inc.*, 523 F.3d 1323, 1341 (Fed. Cir. 2008). Claims are only found to be indefinite when they are "not amendable to construction" or are "insoluably ambiguous." *Star Scientific, Inc. v. R.J. Reynolds Tabacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011)(citation omitted). Definiteness is a question of law that this Court reviews de novo. *Id*.

### B.    The Claim Language is Not Insoluably Ambiguous

Contrary to what Panduit asserts, there are multiple reasons that claim 26 is not insoluably ambiguous. First, the specific claim language at issue is identical. Claim 26 depends directly from independent claim 14. Both recite a "first curved portion."

Second, the surrounding language in both claims is virtually the same. The relevant language from the claims is shown below:

**Claim 14**:  "...a _bottom surface_ having a first curved portion _leading upwardly with respect to the first trough section_, and a second curved portion extending downwardly ..."

**Claim 26**:  "The cable exit trough assembly of claim 14, wherein a first curved portion _of the bottom surface_ _leads upwardly_ after extending over the upstanding side."

Both claims identify the first curved portion as part of a "bottom surface" and explain that the first curved portion "leads upwardly" relative to the first trough section.  These similarities (in addition to having the identical claim language) sharply conflict with Panduit's assertion that it was merely the common use of the word "first" that resulted in the Board's conclusion that there was no ambiguity. See Panduit Brief, p. 51.

Third, Panduit's argument -- that the "first curved portion" in claim 26 could be referring to structure other than the "first curved portion" of claim 14 -- conflicts with the '220 specification.  Each of the claims recites that the "first curved portion" is part of the bottom surface of the exit trough.  There is no discussion in the specification of two upwardly leading curved portions of the bottom surface.  FIG. 8 shows a single upwardly leading curved bottom surface.



upwardly leading
curved portion of the
bottom surface

Fourth, Panduit understood that the recited "first curved portion" in these claims were referring to the same structure. ADC added claim 26 during prosecution following the Examiner's first office action. A447. In its response, Panduit never asserted that the recited "first curved portion" in new claim 26 was ambiguous. Instead, Panduit attempted to explain how the recited "first curved portion" was disclosed in the prior art, thus demonstrating its clear understanding of the meaning of this claim limitation. A438. It was only after the Examiner subsequently issued its Action Closing Prosecution that Panduit began to argue that claim 26 is indefinite.

Panduit's argument that issued claims cannot be cured by claim construction is erroneous. Panduit's argument is based on the flawed assumption that claim 26 has an ambiguity that is in need of being cured. For the reasons set forth above,

the recited "first curved portion" in claim 26 is not ambiguous.  Moreover, the

cases that Panduit cites do not draw a distinction between issued claims and

pending claims.

## CONCLUSION

The Board's rejection of claims 1, 9, 12, 13, and 21 under § 102 based on

Staber should be reversed.  The Board's rejection of claims 10, 14-16, 18, 23, and

26 under § 103 based on Staber plus Scheuermann should be reversed.  The

Board's Decision on all other issues should be affirmed.

Respectfully Submitted,

Dated:  October 4, 2012          /s/Philip P. Caspers
                                 Philip P. Caspers
                                 Timothy A. Lindquist
                                 Samuel A. Hamer
                                 Joseph W. Winkels
                                 CARLSON CASPERS VANDENBURGH
                                 LINDQUIST & SCHUMAN, P.A
                                 225 South Sixth Street, Suite 4200
                                 Minneapolis, Minnesota  55402
                                 Phone: (612) 436-9600
                                 Fax: (612) 436-9605
                                 pcaspers@carlsoncaspers.com

                                 *Attorneys for Cross Appellant*
                                 *ADC Telecommunications, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2012, a true and correct copy of the

foregoing document was served by ECF upon the following counsel of record:

Raymond T. Chen
Tasha.gibbs@uspto.gov

Robert J. McManus
Robert.mcmanus@uspto.gov

John W. O'Mear
jomeara@oliff.com

Scott Weidenfeller
Scott.weidenfeller@uspto.gov

Jesse O. Collier
jcollier@oliff.com

Eric Dean Morehouse
emorehouse@oliff.com

James Oliff
joliff@oliff.com

   /s/ Philip P. Caspers
Philip P. Caspers

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C), Fed. R. App. P., I certify that this brief complies with the type-volume limitation of Rule 28.1, Fed. R. App. P.  This brief contains 16,336 words, calculated by the word processing system used in its preparation.


Dated:        October 4, 2012


                                        /s/ Philip P. Caspers
                                       Philip P. Caspers